**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHRISTOPHER T. SLATTERY, and**
**THE EVERGREEN ASSOCIATION, INC.,**
                                        **Plaintiff,**

         **v.**                                          **1:20-CV-112**
                                                         **(TJM/TWD)**

**ANDREW M. CUOMO, in his official capacity**
**as the Governor of the State of New York;**
**ROBERTA REARDON, in her official capacity**
**as the Commissioner of the Labor Department**
**of the State of New York; and LETITIA JAMES,**
**in her official capacity as the Attorney General**
**of the State of New York,**

                                        **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**


### DECISION & ORDER

Before the Court is Defendants' motion to dismiss Plaintiffs' Complaint.  See dkt. #

22.  Plaintiffs seek declaratory and injunctive relief related to a New York State law aimed

at regulating employment decisions based on an employees reproductive health

decisions.  The parties have briefed the issues and the Court will decided the matter

without oral argument.

### I.    BACKGROUND

This case involves a statute enacted by the State of New York, New York Labor

Law § 203-e ("Section 203-e") that aims at regulating employment decisions that take into

account employees' use of reproductive health services.  Plaintiffs Christopher T. Slattery and The Evergreen Association, Inc. ("Evergreen"), contend that the legislation violates their rights as religious employers who seek to promote a pro-life message by educating women about reproductive health-care choices and providing them pregnancy related services as an alternative to abortion.

Christopher Slattery is President and co-founder of Evergreen.  Complaint ("Complt."), dkt. # 1, at ¶ 1.  Evergreen does business as Expectant Mother Care and EMC FrontLine Pregnancy Centers.  Id.  Evergreen operates "crisis pregnancy centers" throughout New York City.  Id. at ¶ 2.  Those centers have "the morally and religiously motivated mission of saving children from abortion and providing alternatives to abortion."  Id.  Those alternatives include providing "support for mothers who decide against abortion or adoption."  Id.

Slattery, a "sincere practitioner of the Catholic religion," alleges that Catholicism "forbids performing, aiding, assisting or condoning abortion or infanticide under any circumstances and condemns these acts as intrinsic evils and 'abominable crimes.'"  Id. at ¶ 4.  As part of his sincere beliefs, Slattery "has established and enforces" an employment policy at Evergreen that provides that "persons who wish to be hired or remain employed by Evergreen must not obtain, assist in obtaining, or condone abortion, and must not be involved in sexual relationships outside of marriage (such as cohabitation)."  Id. at ¶ 5.  The Catholic religion considers sexual relationships outside of marriage to be "an intrinsic evil in violation of the Sixth Commandment."  Id.  Because of this belief, "Evergreen . . . expects its employees, regardless of their sexual orientation, to observe sexual abstinence outside of marriage."  Id.   Plaintiffs therefore "hire only employees, interns or volunteers . .

2

. who adhere to Plaintiffs' mission and policy of opposition to abortion and sexual relationships outside of marriage, which typically involve the use of contraception that can have abortifacient effects."  Id. at ¶ 6.

Plaintiffs allege that they "profess and promote the moral and religious belief that all human life is equally valuable and deserving of protection, from fertilization until natural death."  Id. at ¶ 30.  They "believe that every abortion claims an innocent life."  Id.  They likewise believe that sexual relationships, including "cohabitation" outside of marriage, are immoral and contribute to "what they oppose as the intrinsic evil of abortion."  Id. at ¶ 31. The "pregnancy care centers" they operate "exist to serve women considering abortion, along with their unborn children" by "provid[ing] the compassion, concern, and support necessary to enable women to carry their unborn children to term."  Id. at ¶ 32.  Plaintiffs seek to serve "primarily poor, low-income and working pregnant women in distressed conditions, many of whom are considering abortions."  Id. at ¶ 33.  Plaintiffs offer these women "counseling, education, ultrasounds and information" during the "decision-making process in an untimely pregnancy."  Id.  Plaintiffs contend that they offer counseling "from a life-affirming, abstinence-promoting perspective only."  Id.

Because Plaintiffs believe that abortion creates more problems for women than it solves and that "the purpose of medical care is to heal and maintain the health of the individual and that abortion does neither for the woman or the baby," they do not "recommend, provide, or refer for abortions, contraceptives, birth control, or abortifacient drugs or devices."  Id. at ¶¶ 35-37.

To achieve these aims, Plaintiffs only hire and maintain the employment of "personnel who agree with, adhere to, and effectively convey Evergreen's mission and

position regarding 'reproductive health decisions' including but not limited to decisions related to abortion and sexual relationships outside of marriage and related use of potentially abortifacient contraception." Id. at ¶ 37. They expect employees "to abide and agree with their positions" on these issues "in both their work and private life." Id. at ¶ 38. Evergreen asks job candidates if they are "pro-choice or pro-life," and does not consider employing pro-choice candidates. Id. at ¶ 39. Evergreen makes these positions clear in advertising from jobs "and specifically states that it is seeking only pro-life candidates." Id. at ¶ 40. Evergreen includes this information in relation to positions like "nurses, counselors, technicians, interns and volunteers." Id. Plaintiffs will not hire persons and will discipline current employees "who refuse to act in accordance with Plaintiffs' position on abortion and sexual relations outside of marriage and Evergreen's corresponding religiously and morally motivated employment policy." Id. at ¶ 41.

Plaintiffs' complaint here is with a particular piece of legislation passed by New York that purported to address employment discrimination. Id. at ¶ 42. Before 2019, Plaintiffs contend, New York law prohibited discrimination based on: "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status." Id. at ¶ 43 (citing N.Y. Executive Law, Article 15, § 296(a)). New York protected pregnant people from discrimination by including "[p]regnancy-related conditions" as part of the statute's definition of "disability." Id. at ¶ 44 (citing N.Y. Executive Law, Article 15, § 292(21-e, 21-f). Section 296 of the Executive law "makes it illegal, among other things, to make hiring or firing decisions, or compensation decisions, on the basis of one of the delineated protected classes." Id. at ¶ 45.

4

New York added to the list of categories offered protection against employment discrimination in early 2019.  Id. at ¶ 46.  New York enacted Section 203-e as part of a series of three bills that addressed abortion rights.  Id. at ¶ 47.  The first two of the bills, Plaintiffs allege, permits abortion "until the birth of the child if the abortion is deemed necessary to protect" the health of the pregnant woman.  Id.  The second bill "requires insurers to provide no-cost coverage for contraceptives" in health plans.  Id.

Rather than amending the New York Human Rights Law, where other anti-discrimination provisions are located, Section 203-e amends New York's Labor Law.  Id. at ¶ 48.  The Senate version of the bill stated as its purpose "to 'prohibit employers from discriminating against employees based on the employee's or dependent's reproductive health decisions, and to provide remedies for such violations.'"  Id. at ¶ 49.  The statute "prohibits discrimination or any retaliatory action by an employer against an employee on the basis of the employee's or his or her dependent's reproductive health decision making, including, but not limited to, a decision to use or access a particular drug, device or medical service."  Id. at ¶ 50.  The statute also prohibits an employer from requiring an employee "to sign a waiver or other document which purports to deny an employee the right to make their own reproductive health care decisions, including use of a particular drug, device, or medical service."  Id. at ¶ 51.  The statute allegedly fails to define "reproductive health decision making" or "employee."  Id. at ¶ 52.  Plaintiffs contend that "employee" might "include Evergreen's interns or volunteers."  Id.  Another portion of the statute requires that an employee that provides an employee handbook "'include in the handbook notice of employee rights and remedies'" under the law.  Id. at ¶ 53 (quoting Section 203-E(3)).

5

Plaintiffs allege that the statute prevents an employer from taking an adverse employment action against an employee because of that employee's "decision 'to use or access a particular drug, device or medical service.'"  Id. at ¶ 54.  Plaintiffs claim that reproductive health decision making "could include not only contraception and abortion, but also *in vitro* fertilization, human cloning, sterilization, sex reassignment surgery, surrogacy, and other highly controversial procedures."  Id. at ¶ 55.  Plaintiffs contend that such a decision could also include "a decision to support or publicly advocate for abortion rights."  Id. at ¶ 56.

Employees have a private right of action under the statute.  Id. at ¶ 57.  Violators face damages, including back pay and attorneys fees, injunctive relief, reinstatement, and liquidated damages.  Id. at ¶ 58.  Plaintiffs also contend that the statute subjects violators to prosecution by the State Attorney General.  Id. at ¶¶ 59-62.

Plaintiffs allege that the legislative history of the bill contains no examples of actual discrimination because of reproductive health decision making in New York State.  Id. at ¶ 63.  When questioned about whether such discrimination was taking place in New York, Assembly member Ellen Jaffee, who sponsored the Act, could cite no examples of such discrimination.  Id. at ¶ 64.

Plaintiffs allege that, though they are subject to the statute, the religious beliefs that guide their operations and their mission mandate that they violate the law.  Id. at ¶¶ 65, 76-77.  As a result, they claim, they will likely suffer sanctions under the law and have their mission undermined.  Id. at ¶¶ 78-79.  They also claim that the statute restricts their freedom of speech and association.  Id. at ¶¶ 67-76.  The statute therefore causes them serious hardship.  Id. at ¶¶ 79-83.  They seek relief from enforcement of the law.

6

Plaintiff's Complaint raises four causes of action.  Count One alleges that Section 203-e violates Plaintiffs' First Amendment right to freedom of association.  Count Two compels speech from the Plaintiffs and therefore violates their First Amendment rights. Count Three alleges a violation of the First Amendment's free exercise clause.  Count IV alleges that the statute violates Plaintiffs' right to equal protection under the Fourteenth Amendment.

After Plaintiffs served Defendants with the Complaint, Defendants filed a motion to dismiss.  The parties then briefed the issue, bringing the case to its present posture.

## II.    LEGAL STANDARD

The Defendants have filed a motion to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants argue that Plaintiffs have not stated a claim upon which relief could be granted, even if all factual allegations in the complaint were proved true.  In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.    ANALYSIS

Defendants seek dismissal of each count.  The Court will address them in turn.

### A.   Free Exercise

Defendants first argue that Plaintiffs have failed to state a First Amendment free exercise claim.  Defendants contend that Plaintiffs have not alleged that the statue's aim is to infringe upon or restrict practices because of their religious motivation or that the aim of the statute is to suppress religion or religious conduct.  Instead, the law is a valid one of general applicability.  As such, the statute needs only to have a rational basis to pass constitutional muster, and the law here does, Defendants claim.  Plaintiffs content that, because they have alleged that Defendants have targeted religion, they have stated a free exercise claim.

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."  Employment Div. v. Smith, 494 U.S. 872, 876 (1990).  "The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'"  Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S.Ct. 2012, 2019 (2017) (quoting Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 533 (1993)).  At the same time, a profession of religious faith does not permit an observant religious person to ignore any law that contradicts that person's religious beliefs: the Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."  Smith, 494 U.S. at 879.  To the contrary, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct his religion prescribes (or proscribes).'"  Id. (quoting United States v. Lee, 455 U.S. 252, 263

n.3 (1982)).  "Where the government seeks to enforce a law that is neutral and of general applicability," the government "need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices."  Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002).

The parties first disagree about whether the statute is neutral.  To show that the statute is neutral and not aimed at religious exercise, Defendants point to the statements of the Senate sponsor of the legislation and the State Assembly's Memorandum of Legislation.  The Memorandum states:

> This bill ensures that employees or their dependents are able to make their own reproductive health care decisions without incurring adverse employment consequences.  The federal Affordable Care Act (ACA) recently required  that  health insurance plans cover FDA-approved birth control methods without out-of-pocket costs.  Some for-profit employers have attempted to prevent employees from accessing this benefit because it conflicts with their personal beliefs.  As a result, over 100 federal lawsuits have been filed by employers to deny  employees  this  benefit, including employers operating in New York State. Employers should not be able to discriminate or interfere in employees' personal medical decisions. While federal and state laws have been enacted which demonstrate a commitment to protect individuals against employment discrimination,  loopholes  exist  which  leave  employees  vulnerable  to discrimination  based  on  their  reproductive  health  decisions.   The  Legislature must  ensure  that  the  legal  loopholes  are  corrected  to  ensure  that  employees' decisions about pregnancy, contraception, and reproductive health are also protected under state law.

Appendix A&B to Defendants' Brief, dkt. #s 22-2, 22-3.

In arguing that the law targets religion, Plaintiffs point to their own religious perspectives.  They oppose abortion and have established a set of employment practices that allow them to stay true to their sincere beliefs.  The Defendants, they claim, have passed a statute that prevents them from acting according to the dictates fo their religion. They point to four paragraphs in the Complaint to argue that they have plausibly alleged

that the statute targets them because of their religious beliefs:

> 127. The Boss Bill is not neutral or generally applicable because it disfavors Plaintiffs' religious beliefs and targets them for punishment, imposing special disabilities on the basis of Plaintiffs' stating or acting according to officially disfavored religious views as opposed to the officially favored "reproductive health decisions" of those who support abortion, abortifacient contraception and sexual relations outside of marriage.
>
> 128. The Boss Bill is not neutral or generally applicable because its legislative history reveals that it is intended to target religious organizations by prohibiting them from maintaining employment practices and standards or conduct in accordance with their religious beliefs.
>
> 129. The Boss Bill is not neutral or generally applicable because its legislative history reveals that it was passed specifically to prevent religious employers, including even churches or priests, from making any employment decision based on religious opposition to abortion, abortifacient contraception, sexual relations outside of marriage or an employee's advocacy thereof.
>
> 130. The Boss Bill was designed precisely to prevent Plaintiffs and other like organizations from operating their organizations in accord with their religiously motivated life missions and beliefs.

Complt. at ¶¶ 127-130.  Plaintiffs also contend that the statute's sponsors did not offer any evidence at the time of the bill's passage that showed actual discrimination on the basis of reproductive health-care decisions.

"To determine neutrality, we begin with the statute's text, 'for the minimum requirement of neutrality is that a law not discriminate on its face."  Cent. Rabbinical Cong. of the Untied States v. New York City Dep't of Health & Mental Hygiene, 763 F.3d 183, 193 (2d Cir. 2014) (quoting Lukumi, 508 U.S. at 533).  The inquiry does not end with facial neutrality, however, "because the neutrality requirement extends beyond facial discrimination."  Id. at 193-194.  "'Official action that *targets religious conduct for distinctive treatment*' must also satisfy strict scrutiny."  Id. at 194 (quoting Lukumi, 508 U.S. at 534 (emphasis added in original)).  A neutral law that "'target[s] the practices of a particular religion'" is not neutral.  Id. (quoting Lukumi, 508 U.S. at 542).  A regulation that

10

*"purposefully* singles out religious conduct performed" by a particular religious group is not neutral.  Id. (emphasis in original).

The statue in question, New York Labor Law § 203-e, provides in relevant part that:

2.     An employer shall not:

> (a) discriminate nor take any retaliatory personnel action against an employee with respect to compensation, terms, conditions, or privileges of employment because of or on the basis of the employee's or dependent's reproductive health decision making, including, but not limited to, a decision to use or access a particular drug, device or medical service; or
> (b) require an employee to sign a waiver or other document which purports to deny an employee the right to make their own reproductive health care decisions, including use of a particular drug, device, or medical service.

N.Y. Labor L. § 203-e(2).

The statute is obviously neutral on its face.  It applies to all employers, regardless of the type of business.  Moreover, an employer who fired an employee who refused to use contraception or decided not to have an abortion would as clearly violate the law as an employer who fired an employee for having an abortion or using contraception.  On its face, then, the statute does not discriminate.

The question here, then, is whether the statute, despite its facial neutrality, targets religious conduct in an impermissible way.   Plaintiffs allege that the statute does in the paragraphs of the Complaint cited above.  Those paragraphs, however, are merely conclusory, offering legal conclusions that recite the legal analysis that the Court would apply to facts that demonstrate improper targeting of religion in a neutral statute.  Those allegations do not offer facts which make plausible that such targeting actually occurred.  Plaintiffs here contend that the statute will have a particular effect on them, because they would like to avoid hiring or terminate the employment of persons whose conduct or

11

beliefs violate their religious tenets.  That the law would affect them does not mean, however, that law targeted their particular religious belief.  The issue of decisions about reproduction is a concern that extends beyond particular religious beliefs and which cuts in all directions, regardless of such beliefs.  A person can easily face employment discrimination for choosing to have a child as for choosing not to do so.  The statements provided by the Defendants and referenced in the Complaint do not indicate that legislators aimed at those opposing abortion in protecting reproductive health care decisionmaking, but simply that legislators had a concern about employers attempting to interfere with what they saw as women's private health care decisions.[1]  Plaintiffs contend that legislators failed to identify particular cases of such discrimination in advocating for the law, but this allegation is not evidence that they singled out religious people in the Statute.  The statement might convince some that the law was unnecessary, but legislators decided otherwise. The statement does not show a desire to aim legislation at particular religious groups.

Since "'the government seeks to enforce a law that is neutral and of general

---

[1]See CompassCare v. Cuomo, No. 19cv1409 (N.D.N.Y.), dkt. # 27, at 37-42, for a fuller discussion of this issue.  The Court concluded:

> the Court cannot find that the evidence presented by the Plaintiffs establishes that the legislature's purpose was "to challenge the plaintiffs' religious beliefs" and instead finds that "there was a neutral, secular purpose" for Section 203-e: protecting New Yorkers' right to make their own decisions about reproduction, including whether to have a child and whether to use birth control.  Commack Self-Service Kosher Meats, Inc. v. Hooker, 680 F.3d 194, 211 (2d Cir. 2012).  In the legislative debates cited above, legislators made clear that they had a concern about employers punishing employees for choosing to use birth control or have an abortion, but the debates also indicate that legislators considered the neutral language in the law a benefit because it would protect whatever choice New Yorkers made about having children.

Id. at 41.  The Court finds that the same reasoning applies here.

applicability, . . . it need only demonstrate a rational basis for its enforcement.'" Fortress

Bible Church v. Felner, 694 F.3d 208, 220 (2d Cir. 2012) (quoting Fifth Ave. Presbyterian

Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002)).   That level of review

requires that the statute "be rationally related to a legitimate state interest."   Lange-Kessler

v. Department of Educ., 109 F.3d 137, 140 (2d Cir. 1997).   "Plaintiffs 'have the burden to

negat[e] every conceivable basis which might support" the statute.   Stormans, Inc. v.

Wiesman, 794 F.3d 1064, 1084 (2d Cir. 2015) (quoting FCC v. Beach Commc'ns. Inc.,

508 U.S. 307, 315 (1993)).   The Defendants argue that the State had a compelling

interest in passing the legislation: protecting individual citizens' right to privacy and

autonomy.  They contend that the statute bears a rational relation to that claim .  Likewise,

the statute bears a rational relationship to the state's interest in advancing laws that

protect against discrimination in the workplace.  The Court agrees that the State has a

legitimate interest in protecting both individuals' right to privacy and personal autonomy as

it relates to health-care decisions surrounding reproduction and a legitimate interest in

protecting against workplace discrimination.  Section 203-e prohibits discrimination on the

basis of choices about reproductive decisions and thus bears a rational relationship to

those aims.  The Court will grant the motion in this respect.

**B.    Free Speech**

Defendants next contend that the Plaintiffs have failed to allege facts sufficient to

support a free-speech claim.  Defendants argue that the statute does not implicate speech

at all, but instead regulates conduct.  The statute also does not, Defendants insist, prevent

employers from expressing their views on reproductive health care matters.

"The First Amendment . . . prohibits laws that abridge the freedom of speech."  Nat'l

13

Inst. of Family & Life Advocates v. Becerra, 138 S.Ct. 2361, 2371 (2018).  Courts

"distinguish between content-based and content-neutral regulations of speech."  Id.

"Content-based regulations 'target speech based on its communicative content.'"  Id.

(quoting Reed v. Town of Gilbert, 576 U.S. ____, ____, 135 S.Ct. 2218 (2015)).  Such

regulations "'are presumptively unconstitutional and may be justified only if the

government proves they are narrowly tailored to serve compelling state interests.'"  Id.

(quoting Reed, 135 S.Ct. 2218).  When a state compels an individual "to speak a

particular message," the state "alter[s] the content of [their] speech,'" and engages in

content-based regulation.  Id. (quoting Riley v. National Federal of Blind of N.C., Inc., 487

U.S. 781, 795 (1988)).  A court is to "apply the most exacting scrutiny" to such restrictions

on speech.  Turner Broad. Sys. v FCC, 512 U.S. 622, 642 (1994).[2]  Under such "strict

scrutiny," a court considers "whether a law is narrowly drawn to serve a compelling

governmental interest."  Evergreen Ass'n v. City of New York, 740 F.3d 233, 245 (2d Cir.

2014).  "The statute must use the least restrictive means to achieve its ends."  Id. (quoting

United States v. Playboy Entm't Group, 529 U.S. 803, 813 (2000)).   The standard is a

difficult one to meet, but "it is not true 'that strict scrutiny is strict in theory, but fatal in

fact.'"  Id. (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995)).  "The

First Amendment is concerned with a *balancing* of interests."  Id. at 247 (emphasis in

original).

---

[2]The Court notes that the strict scrutiny test is different in the context of a free-exercise claim.  In that setting, a court considering whether legislation advances a compelling state interest is to "[look] beyond broadly formulated interests justifying the general applicability of government mandates and [scrutinize] the asserted harm of granting specific exemptions to particular religious claimants."  Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 431 (2006).

Plaintiffs allege that Section 203-e violates their free speech in several ways.  First, Plaintiffs contend that the statute "compels Plaintiffs to speak a message contrary to their moral and religious beliefs not only to their current employees, but also to prospective employees and the public in general."  Complt. at ¶ 101.  They contend that they will be forced to limit their speech about abortion because such speech could be used as "evidence of discrimination" or "a hostile work environment."  Id. at ¶ 102.   Second, Plaintiffs allege that the statute suppresses their speech "by restricting them from expressing preferences as to having employees who share common beliefs as to abortion, and from outwardly expressing pro-life and pro-chastity values in the workplace."  Id. at ¶ 103.  Plaintiffs have a right, they claim, to discuss their views on abortion and sexual morality with their employees.  Id. at ¶ 104.  Punishing such speech, they claim, interferes with their First Amendment rights.  Id. at ¶ 105.

Defendants argue that the statute in question regulates conduct, not speech, and therefore does not violate Plaintiffs' First Amendment rights.  They also contend that Section 203-e does not limit Plaintiffs' ability to communicate their pro-life message or their message about sexual morality, either within or without the workplace.  Plaintiffs respond that "Plaintiffs' uniquely expressive nature means that the people Plaintiffs hire affect their message.  Just as a film company must be able to choose its actors and producers and a news company must be able to choose its editors and writers to convey its desired message, Plaintiffs must also be able to select their staff to convey their desired message."  To permit otherwise, Plaintiffs claim, would "compromise" their message.  They insist they have alleged that Section 203-e "restricts their speech, and regulates its based on content and viewpoint by eliminating the expression of a preference

15

for pro-life workers." The statute must therefore undergo strict scrutiny, an evaluation Plaintiffs claim would fail.

As a general matter, Section 203-e does not serve to limit any of Plaintiffs' advocacy against abortion, promotion of certain religious views, and public arguments for particular versions of sexual morality. The statute does not prevent the Plaintiffs, who provide medical information to pregnant women, from telling those women that they should not get abortions, urging them not to use contraception, or telling them about Plaintiffs' religious beliefs. The statute simply prohibits employers from taking employment action based on the reproductive health decisions of an employee or potential employee. Hiring, firing, or refusing to hire an employee is conduct, not speech, and the law does not implicate Plaintiffs' First-Amendment rights in that.

Plaintiffs' response to that argument is to explain that, because of their unique mission, who they hire is a form of speech, and that Defendants' regulation of such "speech" violates their First Amendment rights. They point to a Ninth Circuit case, McDermott ex rel. NLRB v. Ampesand Publ'g, LLC, 593 F.3d 950 (9th Cir. 2010), to argue that they "must be able to select their staff to convey their desired message." There, the court agreed with an administrative law judge that a newspaper did not have to "reinstate employees it discharged for union activity directed at pressuring the newspaper's owner and publisher to refrain from exercising editorial control over news reporting." Id. at 953. The government or a court "[i]ntervening to support the employees' effort to limit the control of the [newspaper's] owner over its news pages necessarily poses some risk to that owner's First Amendment rights." Id. at 962. In a case where the discharged employees were seeking to undercut the owner's message, "[t]elling the newspaper that it

16

must hire specified persons, namely the discharged employees, as editors and reporters constituting over 20 percent of its newsroom staff is bound to affect what gets published." Id.  In other words, McDermott protected the right of an employer not to employ a person whose speech undermined the employers' preferred message.  The statute here, however, says nothing about the ability to regulate employees' speech.  It limits the ability of an employer to regulate an employee's private conduct with reference to reproduction. Plaintiffs can still refuse to hire or terminate an employee whose speech advocates for positions they disfavor.

Plaintiffs point to Section 203-e's "no waiver" provision to argue that the statute "prevents" them "from telling their employees they must act consistently with organizational beliefs on a variety of topics, including abortion, contraceptives, and sexual morality."  That provision prevents an employer from requiring "an employee to sign a waiver or other document which purports to deny an employee the right to make their own reproductive health care decisions, including use of a particular drug, device, or medical service."  NY Labor Law § 203-e(2)(b).  Plaintiffs contend that this provision violates their rights because they "have the constitutionally protected autonomy to make employment decisions consistent with their religious beliefs and missions,"[3] and therefore must "also be free to explain their employment standards to their employees, and require compliance with those standards.  That requires speech, and" Section 203-e "directly interferes with

---

[3]The Court notes that, at this point, a claim that all of a religious employers' employment decisions are a matter of autonomy and cannot be subject to employment discrimination laws is questionable.  See this Court' discussion of the idea of "religious autonomy" in CompassCare v. Cuomo, dkt. #, at 55-61.  Perhaps the law is moving in a direction that prohibits any interference with religious employers' hiring decisions, but the law is not yet there.

that speech through its no waiver provision."

In evaluating First-Amendment claims, courts "distinguish between content-based and content-neutral regulations of speech." Nat'l Institute of Family & Life Advocates v. Becerra, 138 S.Ct. 2361, 2371 (2018).  A content-based regulation "'target[s] speech based on its communicative content.'" Id. (quoting Reed v. Gown of Gilbert, 576 U.S. ___, ___, 135 S.Ct. 2218, 192 L.Ed2d 236 (2015)).  Such regulations are presumed to violate the constitution and survive only strict scrutiny.  Id.  "In the analysis of whether a regulation is content-based or content-neutral, the 'principal inquiry . . . , in speech cases generally . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d Cir. 2005) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  A regulation "'is content neutral so long as it is justified without reference to the content of the regulated speech.'" Id. (quoting Ward, 491 U.S. at 791) (internal quotations omitted)).  "'A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" Id. at 150 (quoting Ward, 491 U.S. at 791).  "Thus, a regulation that targets only potentially harmful secondary effects of speech, rather than the contents of the speech itself or the listener's agreement or disagreement with those contents, is deemed content-neutral."  Id.

The Court finds that this regulation is content-neutral.  The regulation does not target Plaintiffs' pro-life speech directly and has a primary purpose of regulating conduct, not speech.  The regulation does nothing to prevent Plaintiffs from continuing to speak against abortion, birth control or contraception.  The regulation does not prevent employers from telling employees that certain behaviors are morally objectionable and

contrary to the ethos of their organization.  The regulation simply prevents employers from requiring employees to sign a waiver of the rights Section 203-e protects.  Any restriction on speech in the regulation is secondary to the regulation's purpose: to prevent employers from forcing employees to waive their rights under Section 203-e as a condition of employment.  The Court's conclusion regarding the neutrality of the statute in the free-exercise context supports the Court's conclusion here.

When a regulation is content-neutral, the Court applies "'intermediate scrutiny'" to such a regulation.  Matrovincenzo v City of New York, 435 F.3d 78, 98 (2d Cir. 2006).  Regulations survive that scrutiny when they "'are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alterative channels for communication of that information.'"  Id. (quoting Hobbs, 397 F.3d at 149).  Under this standard, the government does not need to use "'the least intrusive means'" to meet its aims.  Id. (quoting Hobbs, 397 F.3d at 149).  Instead, the government's regulation survives scrutiny "'so long as the . . . [content-neutral] regulation promotes a substantial government interest that *would be achieved less effectively absent the regulation*."  Id. (quoting Hobbs, 397 F.3d at 149) (emphasis in original)).  The regulation here survives such scrutiny.  The government interest here is to prevent discrimination and retaliation against persons who exercise their constitutional rights regarding reproductive health, and the regulation serves that purpose by preventing an employer from conditioning employment on foregoing those rights.  Without the regulation, an employer could use a waiver to regulate the very acts the government seeks to protect.  Moreover, the regulation itself does not prevent employers from speaking on the issue and explaining the views and standards of the organization.  The regulation also does nothing to prevent

employers from advocating for their views to the general public.

The Court will therefore grant the motion in this respect as well.

**C.      Right to Expressive Association**

Defendants next argue that Plaintiff's Complaint fails to state an expressive association claim.  The Supreme Court has concluded that "'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" Boy Scouts of America v. Dale, 530 U.S. 640, 648 (2000) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984)). "[T]he First Amendment's protection extends beyond the right to speak."  Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 68 (2006).  The Amendment also protects the "right to associate for the purpose of speaking, . . . a 'right of expressive association.'"  Id. (quoting Dale, 530 U.S. at 644).  That right exists because "[t]he right to speak is often exercised most effectively by combining one's voice with the voices of others."  Id. "The right to associate also includes the right not to associate."  Hsu by & Through Hsu v. Union Free Sch. Dist. No. 3, 85 F.3d 839, 858 (2d Cir. 1996).  "Insisting that an organization embrace unwelcome members . . . 'directly and immediately affects associational rights.'" Christian Legal Soc'y Campter of the Univ. of Cal. v. Martinez, 561 U.S. 661, 679 (2010) (quoting Dale, 530 U.S. at 659).

Plaintiffs allege that:

90.     Plaintiffs stress the dignity and value of human life, including opposition to abortion and advocacy of sexual abstinence outside of marriage, and they and Evergreen's personnel associate with each other for the purpose of more effectively expressing that viewpoint.  Plaintiffs' insistence on like-mindedness in this common cause among Evergreen's personnel is

constitutionally protected to allow them to engage in free speech and
association.

91.     Plaintiffs Slattery and Evergreen both also engage in protected association
when they counsel clients on alternatives to abortion, which they believe is a
grave moral evil, and on the need for sexual abstinence outside of marriage
to avoid the moral evil of extra-marital sexual relations, which often led to
abortion.

92.     [Section 203-e] restricts the freedom of organizations and individuals such
as Plaintiffs to form expressive associations of those who share a common
commitment to Plaintiffs' moral and religious point of view.  The right to
associate necessarily includes the right to exclude from association.

93.     The State, acting through the named defendants in their official capacities,
violates Plaintiffs' right to freedom of association by denying them the right to
organize their staff, to communicate to staff, to correct, discipline or
terminate staff who reject Plaintiffs' moral and religious position, and to
circulate written materials in accordance with their beliefs that abortion is a
grave moral wrong and that sexual abstinence outside of marriage is a grave
moral duty.

94.     Forcing Plaintiffs to hire, retain, refrain from disciplining or terminating, or
even to refrain from disagreeing with personnel who do not share Plaintiffs'
beliefs–which would potentially constitute "workplace harassment" in
violation of [Section 203-e]–would fatally compromise Plaintiffs' pro-life
message and mission.

Complt. at ¶¶ 90-94.  Plaintiffs also contend that Section 203-e is overbroad, and fails to

represent the least restrictive means of achieving the State's ends.  They further allege

that the statute impermissibly chills their associational rights.

Defendants first argue that Plaintiffs should not be considered an expressive

association.  Plaintiffs allege, Defendants claim, that they operate crisis pregnancy centers

which provide a large variety of services to pregnant women.  They do not allege,

however, that they gather together for the purpose of conveying a message.  Plaintiffs

respond that they engage in expressive activity.  They note that the Complaint alleges that

they work together to transmit a system of values about sex, abortion, and family life, a

"religiously-informed pro-life worldview."  Moreover, Plaintiffs claim, Defendants

misunderstand the law.  Expressive association exists when a group gathers to engage in

expressive activity, even if it has other purposes.

The Court agrees that Plaintiffs engage in expressive association.  "'[E]xpressive association' . . . protects the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances." Sanitation & Recycling Indus. v. City of New York, 107 F.3d 985, 996 (2d Cir. 1997).  "To determine whether a group is protected by the First Amendment's expressive associational right," a court "must determine whether the group engages in 'expressive association." Dale, 530 U.S. at 648. While the expressive association right "is not reserved for advocacy groups[,] . . . a group must engage in some form of expression, whether it be public or private." Id.  Here, the allegations in the Complaint clearly indicate that Plaintiffs aim to share their pro-life message with the world.  While they also offer health-care services to pregnant women, Plaintiffs clearly explain that they do so in the context of sharing with those women their message concerning abortion, sex outside of marriage, and contraception.  As Plaintiffs argue in their briefing, "everything" Evergreen "says and does as part of those services advances Plaintiffs' pro-life messages and mission."  Plaintiffs may also provide ultrasounds and other health services, but Plaintiffs allege that those services are as much in service of their pro-life message as they are assistance to their patients.  In this way, Plaintiffs have alleged facts sufficient to make plausible their claim that they engage in expressive activity.

Even if Plaintiffs have alleged that they form an expressive association, Defendants contend, they have failed to state an expressive association claim.  First, Defendants contend that any burdens that Plaintiffs claim on their expressive association rights are

incidental and insufficient to state a claim.  Plaintiffs are not precluded from hiring only employees who share their beliefs by the statute; they are precluded from discriminating against employees for particular private health care decisions, and Plaintiffs have not alleged plausible facts demonstrating that such hiring would undermine their expressive viewpoint.  Plaintiffs respond that the bill forces them to "associate with and employ those who are diametrically opposed to their pro-life beliefs and mission."  Including such persons "necessarily dilutes Plaintiffs' beliefs and compromises their mission."  The statute forces them to "speak with forced tongue and act as if beliefs and conduct could be divorced from one another without consequence."  Thus, their message would be severely compromised by the restrictions in Section 203-e.

"[T]he right to engage in activities protected by the First Amendment implies 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 548 (1987) (quoting Roberts, 468 U.S. at 622).  To violate the constitution, a law that interferes with such associational rights must "affect in [a] significant way the existing members' ability to carry out their various purposes." Id. As is at issue here, "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." Roberts, 468 U.S. at 623.  "Freedom of association . . . plainly presupposes a freedom not to associate." Id.

The Court concludes that Plaintiffs overstate the interference with their expressive rights imposed in Section § 203-e.  First, the statute does not apply to all people associated with the organization, but only to employees.  The statute does not regulate

volunteers..  Moreover, the statute cannot regulate ministers, since such employees are entitled by the First Amendment to a ministerial exception to employment discrimination laws.  See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 190-191 (2012) (finding that a "ministerial exception" to an otherwise valid employment discrimination law).[4]  Likewise, nothing in the statute requires Plaintiffs to permit their employees to advocate positions contrary to their anti-abortion, pro-marriage, religious agenda.  Plaintiffs could fire an employee who offered a message contrary to the Plaintiffs' views.  Nothing in the statute regulates what Plaintiffs can say about abortion or how they advocate for the rights of unborn persons.  Plaintiffs could fire an employee who advised a patient to have an abortion, use birth control, engage in sex outside of marriage to a person of the opposite sex, or declared that God did not exist and not face any consequences under Section 203-e.  Plaintiffs could also terminate an employee who advocated publically for abortion rights, same-sex marriage, or access to contraception.  As such, nothing in Section § 203-e puts any direct limits on the expressive activity that Plaintiffs insist is at the core of their agenda.

The limitations the law actually imposes are different.  First, Plaintiffs are somewhat correct to complain that they may be forced to associate with employees or prospective employees whose actions indicate that they do not share their views on abortion and other family planning issues. Plaintiffs would not be permitted to fire or take other adverse action against an employee because of that employee's or that employee's dependent's

---

[4]Whether an employee is a minister is a question for an as-applied challenge, and one that will surely be the subject of a number of Supreme Court cases in the coming years.

"reproductive decision making, including, but not limited to, a decision to use or access a particular drug, device, or medial service."  Plaintiffs contend that forcing them to retain employees whose personal lives and actions fail to comport with their ideals would undermine their message.  Plaintiffs' complaint, then, is that Labor Law § 203-e will alter their appearance and thus undermine their message.  People will know that, even though they proclaim a public commitment to a particular message about religion, sexuality, abortion, and contraception, employees may engage in conduct contrary to their professions of faith.

"When evaluating a First Amendment challenge to a limitation on associational freedom, courts apply either strict scrutiny, in which case the restriction survives only if it is narrowly drawn to advance a compelling state interest, or rational basis review, in which case the restriction needs only be rationally related to a legitimate state interest."  Karham v. Lippman, 478 F.3d 502, 506 (2d Cir. 2007).  "Strict scrutiny applies only when a challenged regulation imposes 'severe burdens' on associational rights."  Jacoby & Myers, 852 F.3d at 191.  "Mere incidental burdens on the right to associate do not violate the First Amendment; rather, '[t]o be cognizable, the interference with [plaintiffs'] associational rights' must be 'direct and substantial' or 'significant.'" Tabbaa v. Chertoff, 509 F.3d 89, 101 (2d Cir. 2007) (quoting Fighting Finest, Inc., 95 F.3d 224, 228 (2d Cir. 1996)).

The Court, as explained above, finds that the statute in question imposes some incidental limitations on the Plaintiffs' associational rights, but that those limitations do not place a restriction on their ability to advocate against abortion or contraception, much less a severe one.  A regulation that "make[s] it more difficult for individuals to exercise their freedom of association . . . does not, without more, result in a violation of the First

Amendment." <u>Fighting Finest</u>, 95 F.3d at 228.  The limitations here are not on the speech for which the Plaintiffs contend they associate, but instead threaten to create a situation where hearers might perceive that not all of Plaintiffs' employees practiced what they preached.  The danger that others could call the Plaintiffs hypocrites is not a significant limitation on Plaintiffs' speech or right to associate.  Given the way that our political discourse currently works, such allegations are surely a feature of advocacy in the highly charged area in which the Plaintiffs engage.  The Court also fails to see how a regulation promulgated by the State of New York would cause others to conclude that Plaintiffs are not sincere in their anti-abortion activity.  Plaintiffs can certainly draw a distinction for the public between what they believe and what the State requires.  The Court therefore finds that the Section 203-e question needs only to survive rational basis scrutiny.  As explained above, the regulation does so, and the Defendants motion will be granted in this respect.

D.     **Vagueness**

Defendants next seek dismissal of Plaintiffs' claim that the statute is unconstitutionally vague.  Defendants argue that the statute provides a person of ordinary intelligence a reasonable opportunity to understand the conduct prohibited and does not encourage arbitrary and discriminatory enforcement.  They acknowledge that "reproductive health decisionmaking," and "employee" are not defined in the statute, but argue that those terms are well-understood.  "Employee" has a clear meaning in New York law.  When read in conjunction with the entire statute, Defendants claim, reproductive health decisionmaking also has a clear meaning.  The statute provides examples that explain the term.  That term, Defendants claim, clearly does not implicate public advocacy,

but applies only to private decisions.  Plaintiffs respond that the statute is drawn in a way

that makes unclear what conduct is prohibited.  "Reproductive health decisionmaking"

could very well include speech and advocacy.  Does "employee" include volunteers and

interns?  The statute also fails to define the phrase "proposes to commit a violation of the

provisions of this section," making the statute more ambiguous.

　　　"The void-for-vagueness doctrine reflects the principle that 'a statute which either

forbids or requires the doing of an act in terms so vague that [persons] of common

intelligence must necessarily guess at its meaning and differ as to its application, violates

the first essential of due process of law.'"  Roberts, 468 U.S. at 629 (quoting Connally v.

General Construction Co., 269 U.S. 385, 391 (1926)).  This "requirement that government

articulate its aims with a reasonable degree of clarity . . . ensures that state power will be

exercised on behalf of policies reflecting an authoritative choice among competing social

values," limits inconsistent and discriminatory enforcement of the laws, "enables

individuals to conform their conduct to the requirements of the law, and permits

meaningful judicial review."  Id.  A law must "'be crafted with sufficient clarity to 'give the

person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to

'provide explicit standards for those who apply them.'"  Thibodeau v. Portuondo, 486 F.3d

61, 65 (2d Cir. 2007) (quoting Betancourt v. Bloomberg, 448 F.3d 547, 552 (2d Cir.

2006)).  "'The degree of vagueness tolerated in a statute varies with its type: economic

regulations are subject to a relaxed vagueness test, laws with criminal penalties to a

stricter one, and laws that might infringe constitutional rights the strictest of all.'"

Commack, 680 F.3d at 213 (quoting VIP of Berlin, LLC v Town of Berlin, 593 F.3d 179,

186 (2d Cir. 2010)).  Laws that are "'capable of reaching expression sheltered by the First

Amendment" must supply "'a greater degree of specificity than in other contexts.'" Id.

(quoting VIP of Berlin, 593 F.3d at 186).  A court examining a statute for vagueness is

"relegated . . . to the words of the ordinance itself, to the interpretations of the court below

given to analogous statutes, and perhaps to some degree, to the interpretation of the

statute given by those charged with enforcing it.'" VIP of Berlin, 593 F.3d at 187 (quoting

Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)).  Facial challenges on vagueness

grounds "are generally disfavored."  Dickerson v. Napolitano, 604 F.3d 732, 741 (2d Cir.

2010).

As the Supreme Court explained in Wash. State Grange v. Wash. State

Republican Party, 552 U.S. 442, 450-51 (2008):

> Facial challenges are disfavored for several reasons.  Claims of facial invalidity
> often rest on speculation.  As a consequence, they raise the risk of "premature
> interpretation of statutes on the basis of factually barebones records."  Sabri v.
> United States, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L. Ed. 2d 891 (2004)
> (internal quotation marks and brackets omitted).  Facial challenges also run
> contrary to the fundamental principle of judicial restraint that courts should neither
> "'anticipate a question of constitutional law in advance of the necessity of deciding
> it'" nor "'formulate a rule of constitutional law broader than is required by the precise
> facts to which it is applied.'" Ashwander v. TVA, 297 U.S. 288, 346-347, 56 S.Ct.
> 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting Liverpool, New York &
> Philadelphia S.S. Co. v. Commisioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352,
> 28 L. 3d 899 (1885)).  Finally, facial challenges threaten to short circuit the
> democratic process by preventing laws embodying the will of the people from being
> implemented in a manner consistent with the Constitution.  We must keep in mind
> that "'[a] ruling of unconstitutionality frustrates the intent of the elected
> representatives of the people.'" Ayotte v. Planned Parenthood of Northern New
> Eng., 546 U.S. 320, 329, 126 S. Ct. 961, 163 L. Ed. 2d 812 (2006) (quoting Regan
> v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.. Ed. 2d 487 (1984) (plurality
> opinion).

Wash. State Grange, 552 U.S. at 450-451.

Plaintiffs contend that the statute both fails to provide adequate notice of prohibited

conduct and encourages arbitrary and discriminatory enforcement.  Their challenges

reflects all the difficulties the Supreme Court warned about in Washington State Grange.

Plaintiffs ask the Court to imagine how a statute with a mechanism for civil enforcement

would get carried out, even though litigation will surely test and shape the meaning of that

statute.  They ask the Court to conclude that a statute passed by legislators elected by the

State of New York could never be enforced in a way that comports with the Constitution by

pointing to particular words and phrases and demanding that the Court, before

enforcement, define the meaning of those words.  The Court is reluctant to take such

action on the face of this statute.

Plaintiffs complain that the phrase "reproductive health decision making" used in

the statute is unnecessarily vague.  The statute uses the phrase three times.  The first

instance occurs in reference to a prohibition on "accessing and employee's personal

information."  NY Labor Law § 203-e(1).  The second comes in the statute's prohibition on

discrimination and retaliation for an employee's "reproductive health decision making[.]"

NY Labor Law § 203-e(2)(a).  The third comes in the act's prohibition on requiring an

employee to sign a waiver "purport[ing] to deny an employee the right make their own

reproductive health care decisions."  NY Labor Law § 203-e(2)(b).  In alleging vagueness,

however, Plaintiffs leave out part of the statute's language.  Each of the three mentions of

the term "reproductive health decision making" contain a qualification: "including, but not

limited to, a decision to use or access a particular drug, device or medical service[.]" NY

Labor Law §§ 203-e(1); 203-e(2)(a); 203-e(2)(b).  This qualification helps to explain the

acts the statute prohibits.  An employer cannot take action against an employee who uses

a drug, device, or medical service in relation to reproductive health.  A person of ordinary

intelligence would understand such language to include products related to reproduction

29

such as condoms, other contraceptives, birth-control pills, and medications designed to end pregnancies.  A person of ordinary intelligence would also interpret the statute to prohibit an employer taking action against a person because they chose either to continue or end a pregnancy.  Likewise, a person of ordinary intelligence would understand that the absence of the required language about the rights provided in Section 203-e in an employee handbook or an employer's requirement that the employee waive any rights about decisions regarding pregnancy violates the statute.

The statute does not list specific drugs or medical procedures or specify particular health decisions which the statute protects, but the vagueness "doctrine does not require 'meticulous specificity' from every statute, as language is necessarily marked by a degree of imprecision."  Thibodeau, 486 F.3d at 66 (quoting Farrell, 449 F.3d at 485).  Still, the statute permits an ordinary employer to understand that the law prohibits accessing an employees' medical record to determine whether that employee had used birth control or not, or had an abortion or carried a child to term.  That employer would also understand that New York has prohibited discrimination against or retaliation against an employer for decisions made about birth control or pregnancy.  Given the constant change that characterizes technology and medicine, listing particular drugs or particular procedures would place the statute in danger of becoming quickly irrelevant to the action decisions that people make about reproductive health.

Indeed, this type of statute, which New York has denoted a labor law and which deals with a prohibition on employment discrimination, is designed to deal with the complex social environment represented by the modern American workplace.  Courts have held that "'[t]he degree of a vagueness the Constitution tolerates–as well as the

30

relative importance of fair notice and fair enforcement–depends in part on the nature of the enactment.'" Thibodeau, 486 F.3d 61, 66 (2d Cir. 2007) (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)).  The statute contains a civil right of action as an enforcement mechanism.  As with other statutes prohibiting employment discrimination on the basis of race, ethnicity, sex, or disability, the statute prohibits a category of conduct but relies on litigation to determine whether particular conduct violates the statute.

The Plaintiffs also allege that the lack of definition for the words "employee" and "employer" renders the statute unconstitutionally vague.  The Court is not convinced. First, "employee" has a meaning that a person of ordinary intelligence would reasonably understand.  A dictionary definition provides an example: "a person working for another person or a business firm for pay."  THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (Unabridged Ed., 1979).  "Employer" also has such clear meaning: "a person who employs, esp. for wages."  Id.  The New York Labor Law, where Section 203-e resides, provides a similar definition: "'Employee' means a mechanic, workingman or laborer working for another for hire."  NY Labor Law ¶ 2(5).  That section defines an employer as: "the person employing any such mechanic, workingman or laborer, whether the owner, proprietor, agent, superintendent, foreman, or other subordinate."  NY Labor Law ¶ 5(6).  While Plaintiffs argue that those who do their work include unpaid interns and volunteers, and that the statute does not explicitly exclude them from coverage, the Court is unpersuaded.  A reasonable person would understand that the statute limits protections to those actually employed by an organization, not those who volunteer to assist that group. Likewise, Plaintiffs would surely understand that they are employers, as they hire

31

the people who might sue them.   In any case, the Court concludes that the Plaintiffs'

professed confusion as to the meaning of this term is insufficient to support a facial

challenge to the statute.

Plaintiffs also complain in their briefing that a provision of Section 203-e that

provides a private right of action and permits a court to "afford injunctive relief against any

employer that commits or proposes to commit a violation of the provisions of this section"

is impermissibly vague.  NY Labor Law § 203-e(3)(b).  The Court disagrees.  That portion

of the statute lists the actions a court may take in addressing a private action.  Among the

remedies the Court can fashion are monetary damages, reinstatement, and liquidated

damages.  NY Labor Law § 203-e(3)(a),(c),(d).  The statute also permits the court to

enjoin an employer who violates the prohibition against discrimination or "proposes" to do

so.  NY Labor Law § 203-e(3)(b).  The statute clearly contemplates the Court taking action

to prevent threatened discrimination.  The provision is not unconstitutionally vague.

For those reasons, the Court will also grant the Defendants' motion with respect to

Plaintiffs' vagueness claim.

### E.    Hybrid Constitutional Rights

Defendants next argue that Plaintiffs have failed to allege any sort of a "hybrid"

violation of their constitutional rights.  According to the Defendants, such a claim would

find a violation by combining a Free Exercise violation with another violation, such as a

restriction on free speech or freedom of the press.  While the Supreme Court has

suggested in dictum that such a claim might exist, that claim has never been recognized,

Defendants insist.  The Second Circuit has declined to consider such a right and has

concluded "that claims that are not meritorious when individually pled cannot combine to

state a meritorious one."   Plaintiffs do not respond to this argument. Given the disposition of the other matters relative to the motion, Plaintiffs could not make out a hybrid claim anyway, as they have not alleged a violation of more than one constitutional right.  The Court will grant the motion in this respect.

## IV.     CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss, dkt. # 22, is hereby **GRANTED**.  The Clerk of Court is directed to **CLOSE** the case.

**IT IS SO ORDERED**

**DATED: March 31, 2021**

Thomas J. McAvoy
Senior, U.S. District Judge